**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SEADRILL LIMITED, *et al.*,[1] | ) | Case No. 21-30427 (DRJ) |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THE SETTLEMENT BETWEEN THE DEBTORS AND NORTHERN DRILLING LIMITED AND ITS AFFILIATES**

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession ("Seadrill" or, collectively, the "Debtors") state as follows in support of this motion:

**Introduction[2]**

1. For the past several years, the Debtors have maintained a productive relationship with Northern Drilling Limited ("NODL"), an international drilling contractor. NODL is related to but distinct from Northern Ocean Limited and this proposed settlement is separate from the settlement previously approved by the Court with Northern Ocean Limited. Pursuant to a number

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/SeadrillLimited. The location of Debtor Seadrill Americas, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 11025 Equity Drive, Suite 150, Houston, Texas 77041.

[2] Capitalized terms used but not defined herein shall have the meaning given to them in the Settlement Agreement (defined herein), the First Day Declaration (defined herein), or the Plan (defined herein) as applicable.

of agreements between the Debtors and NODL, several Seadrill entities have, in the past, provided construction supervision, preservation and maintenance, and related services to certain affiliates of NODL in connection with the construction of three of NODL's drillships, the *West Aquila*, the *West Libra*, and the *Cobalt Explorer* (the "Rigs").

2. On May 8, 2018, two NODL affiliates—West Aquila Inc. and West Libra Inc.—entered into separate resale contracts with Daewoo Shipbuilding & Marine Engineering Co., Ltd ("DSME") for the purchase of two rigs, the *West Aquila* and the *West Libra*. Those agreements provided that DSME would complete construction of the *West Aquila* and the *West Libra* subsequent to their purchase by West Aquila Inc. and West Libra Inc. In addition to acquiring the *West Aquila* and the *West Libra*, NODL received an option to purchase the *Cobalt Explorer* from DSME by way of resale agreement. Another NODL affiliate, West Cobalt Inc. (together with NODL, West Aquila Inc., and West Libra Inc., the "NODL Group") exercised that option on April 30, 2019.

3. Alongside the resale agreements, the NODL Group engaged several Seadrill entities, including Seadrill Limited, Seadrill Management Ltd. ("Seadrill Management"), and Seadrill Global Services Ltd. (DMCC Branch) ("SGS," and together with Seadrill Limited and Seadrill Management, the "Seadrill Group") for the provision of construction supervision, preservation and maintenance, and related services for the Rigs. In exchange for these services, the NODL Group agreed to pay a daily management fee to the Seadrill Group. However, in August 2019, the Seadrill Group was informed by the NODL Group that their services would not be required on the *Cobalt Explorer*, and the contract for the *Cobalt Explorer* was cancelled by the NODL Group in October 2019.

4. The Seadrill Group and the NODL Group (each, a "Party," and together, the "Parties") memorialized the agreements for the *West Aquila* and the *West Libra* in written contracts, but have yet to execute them (such agreements, the "Draft Agreements"). As such, the Seadrill Group continued to provide services to the *West Aquila* and the *West Libra* in reliance on the unsigned agreements, which the Seadrill Group believed to be in agreed form between the Parties, and on the assumption that the Parties would execute the Draft Agreements in due course. During the period covered by the Draft Agreements, the NODL Group disputed certain payment obligations, which the Seadrill Group asserted were due and owing for services provided by the Seadrill Group to the *West Aquila* and the *West Libra*. The NODL Group disputed such payments given both the absence of executed agreements between the Parties and the value of the claims that the NODL Group alleges it has against the Seadrill Group. As of the date of this Motion, the Debtors estimate the outstanding amounts they assert are due from the NODL Group to the Seadrill Group for services provided to the *West Aquila* and the *West Libra* to have reached approximately $14.6 million. The NODL Group has also asserted a number of counterclaims alleging that, among other things, the Seadrill Group failed to adequately manage the *West Aquila* and the *West Libra*, in particular, with respect to operational efficiencies, budgeting and reporting of the costs and expenses incurred and alleged delays.

5. Beginning in the first half of 2020, the Parties attempted to work through these issues through exchanges of a series of proposals and counterproposals aimed at resolving the various claims and receivables that the Seadrill Group asserted against the NODL Group and the related counterclaims asserted by the NODL Group. The Parties made substantial progress toward a resolution of these disputes by June 2020, reaching an agreement in principle pursuant to which the NODL Group would make certain payments to the Seadrill Group and execute the Draft

Agreements in exchange for authorization to terminate the Seadrill Group's management of the *West Aquila* and the *West Libra* after June 30, 2020.

6. The Draft Agreements were not executed, however, and negotiations stalled for various reasons. Subsequent negotiations focused on reaching a settlement between the NODL Group and Seadrill in respect of alleged accrued amounts for services provided by the Seadrill Group. The relationship between the NODL Group and DSME, meanwhile, has also deteriorated, and in 2021 it was announced that West Aquila Inc. and West Libra Inc. had cancelled their resale contracts in respect of the *West Aquila* and the *West Libra.* Along with the cancellation of the *Cobalt Explorer* contract, Seadrill understands that DSME has initiated arbitration proceedings challenging these cancellations (such proceedings, the "DSME Disputes").

7. Further complicating the Parties' relationship is the fact that NODL—and by extension, the other entities that compose the NODL Group, as well as Northern Ocean Limited, a former NODL subsidiary—shares a common equity holder with the Debtors. Specifically, Hemen Holding Ltd. ("Hemen"), which holds 9.99% of the equity of Seadrill Limited prior to the effectiveness of the Debtors' plan of reorganization (as may be amended, supplemented, or modified from time to time, the "Plan"),[3] also holds approximately 39.4% of the equity of NODL. Cognizant of potential conflicts, the Debtors took numerous steps to ensure independent consideration and resolution of the disputes with the NODL Group, including requiring the recusal of a related director and bringing all issues for appraisal by a committee of non-conflicted, disinterested directors.

[3] *See Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Seadrill Limited and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1158].

8. In July 2021, the Parties renewed settlement discussions. After many months of good faith, arm's-length negotiations, the Parties reached an agreement on the terms of a settlement (the "NODL Settlement"), which would resolve all of the claims and receivables asserted against the NODL Group and those counterclaims asserted against the Seadrill Group. Among other things, the settlement negotiations focused on terminating the Seadrill Group's provision of construction supervision, preservation and maintenance, and related services to the Rigs and assistance and potential indemnification with respect to the DMSE Disputes.

9. The NODL Settlement provides for the following key terms:

- the Parties agree to fully and finally settle all claims for outstanding costs, expenses, and management fees in connection with the services provided to the *West Aquila*, the *West Libra*, and the *Cobalt Explorer*, as well as counterclaims raised by the NODL Group arising out of the Draft Agreements without any Party admitting liability pursuant to any claim or counterclaim raised or to be raised by any other Party;

- each of the Parties covenants in favor of the other that after executing the Settlement Agreement (defined below), neither Party will assert any claims against the other Party in connection with the events giving rise to the Settlement Agreement (unless the effective date of the NODL Settlement does not occur by January 31, 2022);

- for a period of up to six months after the Effective Date, the Seadrill Group agrees to provide the NODL Group with limited assistance, including by granting access to information related to its provision of services to the Rigs and allowing reasonable interviews of the Seadrill Group's members, employees, and directors, if required for the purposes of any of the DSME Disputes, the NODL Group covering the cost of such assistance;

- the NODL Group will indemnify the Seadrill Group for any liability arising from the DSME Disputes and will undertake not to take any step to join or otherwise involve any Seadrill Group company in the DSME Disputes; and

- all other agreements between the Parties, whether written, oral, or established by a course of conduct, shall terminate on the Effective Date.

10. The Debtors believe that the commercial resolution embodied in the NODL Settlement is in the best interest of the Debtors. The NODL Settlement provides the Debtors with greater certainty by resolving the claims and counterclaims that each of the Parties holds against

the other. This will prove essential in the Debtors' broader restructuring efforts and reaching a successful outcome in these cases. As described in detail below, the NODL Settlement satisfies the controlling standards under Bankruptcy Rule 9019. The resolution described herein is not only "fair, equitable, and in the best interest of the estate," but is also a favorable outcome for the Debtors' estates and paves the way for swift and efficient emergence from chapter 11.

## Relief Requested

11. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"), approving the settlement by and among the Seadrill Group and the Northern Drilling Group embodied in the settlement agreement attached as **Exhibit A** (the "Settlement Agreement") authorizing the Debtors to take all actions necessary to consummate the NODL Settlement.

## Jurisdiction and Venue

12. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the Parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14. The bases for the relief requested herein are section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules").

## Background

15. On September 12, 2017, Seadrill Limited and 85 of its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Seadrill Limited in its current formulation was incorporated in March 2018 and it became the parent of the Seadrill enterprise when Seadrill emerged from chapter 11 on July 2, 2018.

16. On February 7, 2021, Asia Offshore Drilling Limited and four affiliated Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On February 10, 2021 (the "Petition Date"), Seadrill Limited and the remaining above-captioned Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[4] A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Grant Creed, Chief Restructuring Officer of Seadrill Limited, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is incorporated by reference herein.

17. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On February 11, 2021, the Court entered an order [Docket No. 27] authorizing procedural consolidation and joint administration of these chapter 11 cases pursuant to Rule 1015(b) and Local Rule 1015-1. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

---

[4] On December 1, 2020, Seadrill Partners LLC ("Seadrill Partners") and 28 affiliated debtors and debtors in possession commenced chapter 11 cases in this Court, which are jointly administered under the case caption *In re Seadrill Partners LLC*, No. 20-35740 (Bankr. S.D. Tex.) (collectively, the "Seadrill Partners Cases"). Seadrill Partners emerged from their chapter 11 proceedings on May 24, 2021.

## I. The Parties and Claims

18. NODL was incorporated under the laws of Bermuda on March 2, 2017, and is an international offshore drilling contractor engaged primarily in drilling in ultra-deep water environments. Between May 2018 and June 2020, the Seadrill Group purported to contract with the NODL Group to provide construction supervision, preservation and maintenance, and related services to three of the NODL Group's ultra-deepwater capable drillships, the *West Aquila*, the *West Libra*, and the *Cobalt Explorer* (in respect of the *Cobalt Explorer*, for a shorter term than for the other Rigs). Pursuant to several unsigned agreements between the Parties, the Seadrill Group was to be paid a daily management fee in exchange for these services. The NODL Group disputes the extent of the services provided and the obligations arising out of those services, however, and significant amounts owed to the Seadrill Group remain unpaid. The Seadrill Group undertook significant efforts to obtain payment of the outstanding receivables, including brokering executive-level commercial discussions. The NODL Group disputed the amounts owed to Seadrill Group and asserted that a valid, enforceable agreement did not exist under which payment was required. The Seadrill Group asserted that services were rendered in reliance on the Draft Agreements and therefore the Seadrill Group was entitled to payment.

## II. The Settlement Process and Considerations

19. Recognizing the potential conflict involved in settling claims with the NODL Group, the Debtors implemented significant precautions to ensure that any resolution of the claims was in the best interest of the Debtors and all their creditors. Specifically, one of the Debtors' former directors, who is associated with Hemen, recused himself from decisions regarding the NODL Settlement. Additionally, all issues and decisions were considered by Seadrill's audit and risk committee (the "Audit & Risk Committee"), which consisted of non-conflicted, independent directors, to further ensure separateness and disinterestedness in an eventual resolution with the

NODL Group. This committee consisted of two directors, both of whom qualified as independent under applicable rules.[5] The Audit & Risk Committee met on numerous occasions to discuss the ongoing negotiations and to endorse the NODL Settlement, and played an important role by testing the pros and cons of the settlement with the Debtors' management team and making recommendations to the Debtors' non-conflicted board members.

20. The Debtors were focused on obtaining a definitive resolution that would provide certainty going forward, including by relieving the Parties of their obligations under the Draft Agreements. The Debtors believe that the NODL Settlement—the product of months of extensive, good-faith negotiations—is in the best interest of the Debtors. The effectiveness of the NODL Settlement and the resolutions embodied therein are expressly conditioned upon the Court's entry of an order approving the NODL Settlement.

## **Basis for Relief**

### I. The NODL Settlement Is a Sound Exercise of the Debtors' Business Judgment and a Favorable Resolution of the Debtors' Claims Against the NODL Group.

21. Bankruptcy Rule 9019(a) provides that, "after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity v. Herpel (In re*

[5] The Audit & Risk Committee was comprised of three members until December 2020. Both of the current members are independent pursuant to rule 10A-3 of the Securities Exchange Act and the independence standards required by the Oslo Stock Exchange.

*Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

22. Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, approval of a compromise is within the "sound discretion" of the bankruptcy court. *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984); *see also Jackson Brewing Co.*, 624 F.2d at 602–03 (same).

23. Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993). Instead, the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).[6]

24. "Great judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) (citation omitted). "As long as [the decision] appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision . . . should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing Co.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation omitted).

[6] Further, under section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Authorizing the Debtors to proceed with the NODL Settlement falls squarely within the spirit of Bankruptcy Rule 9019, if not the letter, as well as the Bankruptcy Code's predilection for compromise. Thus, to the extent necessary, section 105(a) relief is appropriate in this instance and would best harmonize the settlement processes contemplated by the Bankruptcy Code.

25. The resolution embodied in the NODL Settlement is commercially reasonable and represents a fair and equitable compromise that is in the best interests of the Debtors' estates.

## II. The NODL Settlement Satisfies the Three-Factor Test Courts in the Fifth Circuit Employ to Analyze Proposed Settlements.

26. The Fifth Circuit has established a three-factor balancing test under which bankruptcy courts are to analyze proposed settlements. The factors a court must consider in determining whether a compromise is "fair, equitable, and in the best interest of the estate" are: "(1) [t]he probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) [t]he complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) [a]ll other factors bearing on the wisdom of the compromise." *Jackson Brewing*, 624 F.2d at 600; *see also Age Ref. Inc.*, 801 F.3d at 540 (same); *In re Roqumore*, 393 B.R. 474, 479 (Bankr. S.D. Tex. 2008) (same).

27. Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. ***First***, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (Matter of Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995); *see also Age Ref. Inc.*, 801 F.3d at 540 (noting the *Foster Mortgage* factors). "While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'" *Foster Mortg. Corp.*, 68 F.3d at 917 (quoting *In re Transcon. Energy Corp.*, 764 F.2d 1296, 1299 (9th Cir. 1985)). ***Second***, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortg. Corp.*, 68 F.3d at 918 (citations omitted).

**A. Probability of Successful Recovery from Litigating the Claims Subject to the NODL Settlement Is Uncertain.**

28. The resolution of claims and counterclaims under the NODL Settlement was heavily negotiated and properly balances each Party's respective litigation position. Litigating these claims would be costly to both Parties. The crux of the NODL Group's asserted claims is that the Seadrill Group mismanaged the Rigs by failing to deliver the Rigs on time and within the allocated budget. Although the Seadrill Group strongly disputes these claims, resolving such fact-intensive inquiries would be a costly and uncertain endeavor. Further, even if the Seadrill Group overcame the NODL Group's claims and successfully obtained a judgment on its own claims through litigation, that judgment and its collectability are uncertain in that, among other risks, it could trigger an insolvency proceeding for the NODL Group (which is currently without any rigs in its fleet), in which the Debtors' claims would be treated as general unsecured obligations, and in which any recovery would likely be extremely limited. Regardless of the outcome of potential litigation, the NODL Settlement results in a settlement of all claims and counterclaims between the Seadrill Group and the NODL Group, the ability to continue go-forward operations with NODL on a more sustainable basis, and increased support for the Debtors' eventual emergence from chapter 11.

**B. Litigation with the NODL Group Would Be Complex, Costly, and Distracting.**

29. With respect to "the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay," litigation with the NODL Group would likely be costly and time-consuming. As described above, litigating the NODL Group's counterclaims concerning the Seadrill Group's management of the Rigs would undoubtedly be costly, fact-intensive, and time-consuming. Burdening the Debtors with the cost of litigation in addition to the general administration of these chapter 11 cases for the foreseeable future would frustrate their efforts to

successfully emerge from chapter 11, to the detriment of the Debtors' estates and all parties in interest. The NODL Settlement, meanwhile, fully and finally resolves the Parties' claims and will enable the Debtors to maintain their commercial relationship with the NODL Group. Consummation of the NODL Settlement will allow the Debtors to avoid the expenditure of critical resources on litigation, eliminate the risk involved in recovering amounts owed, and help the Debtors to chart a course toward emergence from chapter 11.

### C. The NODL Settlement Is In the Best Interests of the Estates.

30. The NODL Settlement will provide all stakeholders with certainty regarding the resolution of the disputes. The Debtors and the NODL Group have spent months negotiating the terms of the NODL Settlement, which not only settles disputes but also materially improves the Debtors' relationship with the NODL Group going forward, to the benefit of all Parties.

31. Based on the foregoing considerations, the Debtors respectfully submit that the NODL Settlement represents a fair and reasonable compromise that is in the best interests of the Debtors' estates and all parties in interest. Accordingly, the Debtors respectfully request that the Court authorize and approve the NODL Settlement and allow the Debtors to implement the terms thereof as set forth in the Order.

### D. The Releases in the NODL Settlement Are Customary and a Crucial Part of the Settlement.

32. The mutual releases contained in the NODL Settlement, including in respect of any and all claims that the Parties have against each other in relation to the Draft Agreements and the services provided to the Rigs, are standard and customary, and advantageous to the Debtors, as they add finality, are being given in exchange for substantial value, and are necessary and appropriate parts of the resolution. Moreover, the releases are not effective until, among other things, the Court enters an order approving the NODL Settlement.

**Reservation of Rights**

33. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

34. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the agents for each of the Debtors' senior secured credit facilities; (d) counsel to the CoCom; (e) counsel to the ad hoc

group of various lenders under the Debtors' secured credit facilities; (f) the Office of the United States Attorney for the Southern District of Texas; (g) the state attorneys general for states in which the Debtors conduct business; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (k) the NODL Group; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (m) any other party entitled to notice pursuant to Local Rule 9013-1(d). In light of the nature of the relief requested, no further notice is required. In light of the nature of the relief requested, no further notice is required.

## Conclusion

The Debtors request entry of the Order, granting the relief requested herein and granting such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
December 20, 2021

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Vienna F. Anaya (TX Bar No. 24091225)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
jwertz@jw.com
vanaya@jw.com
vargeroplos@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Spencer Winters (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: asathy@kirkland.com
rkwasteniet@kirkland.com
spencer.winters@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher Marcus, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: cmarcus@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Service**

I certify that on December 20, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh